1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    DONTRELL COLLINS,                          No.  1:25-cv-00206-KES-SKO (HC)

12                    Petitioner,                **FINDINGS AND RECOMMENDATION
                                                 TO DENY PETITION FOR WRIT OF
13          v.                                   HABEAS CORPUS**

14    MARTIN GAMBOA,                             **[TWENTY-ONE DAY OBJECTION
                                                 DEADLINE]**
15                    Respondent.

16

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254. He filed a first amended petition on April 14, 2025, challenging a

19   2017 conviction for second degree murder and related charges. (Doc. 8.) Respondent filed an

20   answer to the petition on June 25, 2025. (Doc. 17.) Petitioner did not file a traverse.  Upon review

21   of the pleadings, the Court finds that the petition is without merit and will recommend it be

22   **DENIED**.

23   **I.      STATE COURT PROCEDURAL HISTORY**

24          Petitioner was convicted in the Kern County Superior Court on November 16, 2017, of

25   two counts of second degree murder (Cal. Penal Code § 187); two counts of gross vehicular

26   manslaughter while intoxicated (Cal. Penal Code § 191.5); two counts of driving while

27   intoxicated and causing injury (Cal. Vehicle Code § 23153(a) & (b)); one count of resisting an

28   executive officer (Cal. Penal Code § 69); and one count of committing a crime while in custody

                                                  1

(Cal. Penal Code § 653.75). (Doc. 14-20 at 175-78.[1]) On January 17, 2018, he was sentenced to serve an indeterminate prison term of 73 years and four months to life. (Doc. 14-20 at 175-78.)

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA").  On February 2, 2021, the Fifth DCA denied Petitioner's claims of ineffective assistance of counsel and insufficiency of the evidence. People v. Collins, 60 Cal. App. 5th 540, 546, 274 Cal. Rptr. 3d 775, 779 (2021). The court agreed with Petitioner that the trial court had erred in applying the wrong standard to his Batson/Wheeler[2] motion. Id. The court conditionally reversed the judgment and remanded the case to the Kern County Superior Court to conduct the second and third stages the Batson/Wheeler inquiry to determine whether the prosecutor violated Petitioner's due process rights in excusing a prospective Black juror. Id. On March 21, 2021, Petitioner filed a petition for review in the California Supreme Court with respect to the appellate court's denial of his claims of ineffective assistance of counsel and insufficiency of the evidence. (Doc. 14-26.) The California Supreme Court summarily denied the petition for review on April 21, 2021. (Doc. 14-27.)

On remand to the Kern County Superior Court, the trial court conducted steps two and three of the Batson/Wheeler inquiry and found Petitioner had failed to prove purposeful discrimination. (Doc. 14-33 at 108-15.) The trial court reinstated the judgment. (Doc. 14-33 at 115.) Petitioner appealed to the Fifth DCA. On November 1, 2023, the appellate court affirmed the judgment. (Doc. 14-41.) Petitioner petitioned for review in the California Supreme Court. On January 10, 2024, the California Supreme Court summarily denied the petition. (Doc. 14-43.)

**II.    FACTUAL BACKGROUND[3]**

The evidence established Petitioner drove his vehicle at an extremely fast speed on a highway with multiple stoplights. California Highway Patrol Officer Boshers first noticed Petitioner's vehicle and registered it on his radar at 95 miles per hour. Boshers made a "U-turn"

---

[1] Citations are to ECF pagination.

[2] Batson v. Kentucky, 476 U.S. 79 (1986); People v. Wheeler, 22 Cal.3d 258 (1978).

[3] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Therefore, the Court will rely on the Fifth DCA's summary of the facts as set forth in Collins, 60 Cal. 5th 540, 545–46. See Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

1    to follow the vehicle but was unable to catch up.  Multiple other people witnessed the incident.

2    One witness described Petitioner's vehicle "driving really, really fast," and saw Petitioner swerve

3    and almost lose control. He believed Petitioner drove through a red light at over 90 miles per

4    hour.

5         Another witness estimated Petitioner's vehicle was traveling about 120 miles per

6    hour. The car was moving so fast it was "wobbl[ing] . . . ." The car drove straight through

7    a red light with other vehicles at the intersection.  Another person witnessed Petitioner's

8    vehicle speeding at "about a hundred miles an hour, jump[ ] up on the center divider, and

9    then c[o]me down off the divider and r[u]n into the back of another car" that was slowing

10   for a red light. The collision "caus[ed] both vehicles to explode," engulfing the rear-ended

11   vehicle in flames. Two young women died in the fire and a third survived with serious,

12   long-term injuries and anguish.

13        A roadside investigation near the collision concluded with Petitioner's arrest.

14   During the investigation, Petitioner described driving along the road, trying to slow down,

15   engaging the brakes, and colliding with another vehicle from behind. The law

16   enforcement officer conducting the investigation believed Petitioner had driven under the

17   influence of alcohol (DUI). A preliminary breath test registered at ".11 percent" "breath

18   alcohol content." A later blood test registered a ".071 percent . . . blood alcohol content"

19   positive for PCP.

20        Petitioner was then booked into the local jail. A few hours later, he was involved

21   in a physical altercation with a guard at the jail. A few days later he was interviewed by a

22   law enforcement officer. In response to a question about how "often he drank and drove,"

23   he responded, "[T]oo many times."

24        Petitioner's girlfriend testified at the trial. She stated she had warned him not to

25   drive "high" on a near daily basis.  An investigator from the Department of Motor

26   Vehicles also testified. The investigator produced four forms Petitioner had signed in the

27   five years preceding this collision. Each form included a warning about the dangers of

28   drinking and driving. His signature acknowledged he read each warning.

1    Dr. Michael Musacco, a psychologist, testified about Petitioner's mental health.

2    He testified Petitioner suffered from "a persisting substance-induced mental illness." He

3    opined Petitioner was capable of understanding the nature and quality of his actions and

4    the difference between right and wrong. In response to the prosecutor's questioning, Dr.

5    Musacco agreed Petitioner knew the nature and quality of his actions and the difference

6    between right and wrong when the collision occurred.

7    **III.    DISCUSSION**

8        A.    Jurisdiction

9    Relief by way of a petition for writ of habeas corpus extends to a person in custody

10    pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

11    treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor,

12    529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as

13    guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern

14    County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. §

15    2254(a); 28 U.S.C.§ 2241(d).

16    On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

17    1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

18    enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

19    filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

20    and is therefore governed by its provisions.

21        B.    Legal Standard of Review

22    A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

23    the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

24    that was contrary to, or involved an unreasonable application of, clearly established Federal law,

25    as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

26    based on an unreasonable determination of the facts in light of the evidence presented in the State

27    court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

28    Williams, 529 U.S. at 412-413.

4

Under Section 2254(d)(1), a state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406). This court looks to "Supreme Court holdings at the time of the state court's last reasoned decision" as "the source of clearly established Federal law for the purposes of AEDPA." Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005). A Supreme Court precedent is not clearly established law under section 2254(d)(1) unless the Court "squarely addresses the issue" in the case before the state court. Wright v. Van Patten, 552 U.S. 120, 125–26 (2008) (per curiam) (concluding that a state court had not unreasonably applied federal law to a claim of prejudice under Strickland where the logic of petitioner's argument would have required the extension of the Supreme Court's inherent prejudice doctrine to a new context); Carey v. Musladin, 549 U.S. 70, 76–77 (2006) (same). While "[c]ertain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt," Yarborough v. Alvarado, 541 U.S. 652, 666 (2004), "when a state court may draw a principled distinction between the case before it and Supreme Court caselaw, the law is not clearly established for the state-court case." Murdoch v. Castro, 609 F.3d 983, 991 (9th Cir. 2010). "'[I]f a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state court decision.'" White v. Woodall, 572 U.S. 415, 426 (2014) (quoting Yarborough, 541 U.S. at 666).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). The petitioner "must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'" Shinn v. Kayer, 592 U.S. 111, 118 (2020) (quoting Virginia v. LeBlanc, 582 U. S. 91, 93 (2017) (per curiam)). Rather, a state

5

1   prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's

2   ruling on the claim being presented in federal court was so lacking in justification that there was

3   an error well understood and comprehended in existing law *beyond any possibility of fairminded*

4   *disagreement*." Richter, 562 U.S. at 103 (emphasis added); see also Kayer, 592 U.S. at 118. In

5   other words, so long as fairminded jurists could disagree with each other as to whether the state

6   court was correct, the state court decision is not unreasonable under AEDPA. Congress "meant"

7   this standard to be "difficult to meet." Richter, 562 U.S. at 102.

8       Section 2254(d)(2) pertains to state court decisions based on factual findings. Davis v.

9   Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

10  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

11  petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

12  facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539

13  U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). The federal habeas

14  court must give "substantial deference" to the state court. Brumfield v. Cain, 576 U.S. 305, 314

15  (2015). "Factual determinations by state courts are presumed correct" and the petitioner bears the

16  burden of overcoming the presumption with "clear and convincing evidence to the contrary."

17  Miller-El, 537 U.S. at 340; 28 U.S.C. § 2254(e)(1). A state court's factual finding is unreasonable

18  when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries,

19  114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*,

20  Maddox v. Taylor, 543 U.S. 1038 (2004). If "'[r]easonable minds reviewing the record might

21  disagree' about the finding in question, '. . . that does not suffice'" to prove the lower court's

22  factual determination was unreasonable. Wood v. Allen, 558 U.S. 290, 301 (2010) (alteration in

23  original) (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)).

24      To determine whether habeas relief is available under § 2254(d), the federal court looks to

25  the last reasoned state court decision as the basis of the state court's decision. See Ylst v.

26  Nunnemaker, 501 U.S. 979, 803 (1991); Andrews v. Davis, 994 F.3d 1042, 1107 (9th Cir. 2019)

27  (en banc). "[A]lthough we independently review the record, we still defer to the state court's

28  ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

6

1    The prejudicial impact of any constitutional error is assessed by asking whether the error

2    had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

3    Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

4    (holding that the Brecht standard applies whether or not the state court recognized the error and

5    reviewed it for harmlessness).

6        C.    Review of Claims

7    Petitioner claims: 1) The state court unreasonably determined that Petitioner had failed to

8    prove purposeful discrimination in the prosecutor's exercise of a peremptory challenge; 2) The

9    state court unreasonably found that sufficient evidence supported the finding that Petitioner acted

10   with implied malice; and 3) The state court unreasonably determined that counsel did not render

11   ineffective assistance by failing to object to the cross-examination testimony of Dr. Musacco and

12   the prosecutor's closing remarks concerning Dr. Musacco's opinion.

13        1.    Ground One - Batson Challenge

14            a.    Procedural Background

15   Petitioner contends the prosecutor purposefully discriminated against him by exercising a

16   peremptory challenge in violation of his constitutional rights pursuant to Batson v. Kentucky, 476

17   U.S. 79 (1986). Petitioner claims the state court erred in denying his Batson challenge concerning

18   prospective juror Margo S.  The claim was first presented on direct appeal. The appellate court

19   determined that although the trial court had conducted a Batson hearing, it erred in conducting the

20   first step. (Doc. 14-25.) The appellate court remanded the case to conduct the second and third

21   steps, if it were still possible to do so. On remand, the trial court concluded it could do so and

22   conducted a Batson hearing. (Doc. 14-41.) Ultimately, the trial court found Petitioner had failed

23   to prove purposeful discrimination. The Fifth DCA affirmed in a reasoned decision. (Doc. 14-41.)

24   The California Supreme Court summarily denied review.

25            b.    Factual Background of Peremptory Challenge

26   The appellate court summarized the facts underlying the peremptory challenge as follows:

27       Jury selection in this case began with direct questioning to 17 prospective jurors.
         The remaining prospective jurors from the venire were asked to pay attention to
28       each question and answer so they would be "ready to respond with answers

7

applicable to [the] questions."

….

The court asked each of the 17 jurors several questions, including whether they personally or a close friend or family member was "charged with or accused of committing a crime ...." Juror 4237967's brother was arrested for a crime. The juror formed an opinion about whether the brother was treated fairly or unfairly and could set aside the brother's experience in serving as a juror in this case.

Juror Michael B. himself was involved with a crime. He answered he was convicted and the case was dismissed. Those answers were not clarified. He never formed an opinion about whether he was treated fairly and could set aside his experience.

Juror Betty B. had two sons with cases involving DUI charges. One of her sons was twice imprisoned. She believed she could set aside their experiences and serve fairly as a juror.

Juror 4301270's stepson was arrested once. Her own son was convicted of a DUI by plea. She formed no opinion on whether they were treated fairly and could set their experiences aside and serve impartially. She would not hold against Collins his exercising his right to a trial instead of pleading guilty.

Juror 4552487 was previously convicted of a DUI. The juror formed an opinion about whether he or she was treated fairly and could set aside his or her own experience in serving as a juror. The juror would not hold against Collins his exercising his right to a trial.

Juror John V. himself was convicted of DUI by plea. He believed he was treated fairly. His experience would not influence his role as a juror. He would not hold against Collins his exercising his right to a trial.

Juror 4462349's parents were involved with a crime. The juror did not form an opinion about whether his or her parents were treated fairly and could set aside his or her experience and serve fairly as a juror.

The jurors introduced themselves after answering the court's initial inquiries. Juror Brad D. worked for Kern County Behavioral Health and Recovery Services. He had training or experience with detecting or recognizing mental illness. He thought he could set aside his training and rely solely on the evidence in this case.

The prosecutor collectively asked the same 17 jurors if "anybody ... had a negative experience with law enforcement?" Only Betty B. replied affirmatively.

The prosecutor then stated he believed "that if you've been charged with a crime or you've been convicted or something that everyone has an opinion whether they've been treated fairly or not ...." He followed up by directly asking Juror 4552487 if he or she was treated fairly. The juror responded, "Yes."

After this initial questioning concluded, the parties began exercising peremptory challenges against the jurors seated in the 12-person jury box. The potential alternates, seated outside the box, would take the place of each excused juror so that there were always 12 jurors in the jury box.

8

Each party exercised three peremptory challenges, reducing the prospective jurors in the box to 11. Each of the above identified and discussed jurors remained among the 11. Seven more jurors were then seated to fill the prospective panel with 18 total jurors, including Margo S.

Margo S. introduced herself as "a psych tech at the Department of Corrections." The court followed up by asking if she "[w]ould ... be able to set aside [her] [professional] training and experience" while serving as a juror in this case. She twice answered, "Yes."

The court then asked the seven new jurors if they or someone close to them had "ever been charged with or accused of committing a crime ...." Margo S. replied she was "charged with a petty theft when [she] was younger, and [had] a couple of cousins who [were] in prison ...." She explained one of her cousins "attacked his mom" during "a mental breakdown" and the other "had assault charges." She was not close to her cousins and could set aside her own as well as their experiences in serving as a juror.

In response to Collins's attorney, Margo S. divulged her familiarity with mental health medications. She added that she would like to correct any evidence during the trial that conflicted with her training but would not do so if that was disallowed.

When the prosecutor resumed questioning, he directly asked two of the seven new jurors if they were treated fairly by law enforcement. [Fn.5] He then collectively asked the others if they had any negative experiences with law enforcement. Margo S. did not respond.

> [Fn.5] Those two jurors had described experiences with law enforcement that are not otherwise relevant.

After the parties concluded their questioning, the prosecutor "accept[ed] the panel as presently constituted." At that point, the panel consisted of every juror identified above. Margo S. was in seat 14.

Collins did not accept the panel and instead excused one juror, followed by the prosecutor responding in kind. Margo S. then moved into seat two. After Collins excused another juror, the prosecutor excused Margo S., prompting the present motion.

….

Outside the jury's presence, Collins's attorney explained Margo S. was "obviously an African American woman ... which is ... Mr. Collins' racial group." The challenge was premised on the fact counsel "didn't hear anything in her comments that would indicate a race-neutral reason for excusing her ...."

The court responded it must determine if "the excusal led to a reasonable inference of a discriminatory nature and, by virtue of deduction, there was no other reason under which the prospective juror should have been excused or released." The court subsequently denied the motion, finding Collins "failed to demonstrate a prima facie case that would lead one to reasonably believe that the only reason Ms. [S.] was released from this panel is for a discriminatory purpose ...."

The court added, "[B]ased on the direct observations that the Court had in having

9

the opportunity to question Ms. [S.], it did appear to the Court that not only based on her profession does she have some understanding of potential evidence that might be presented in this case, even though she can set it aside, but just as importantly, if not more importantly, she herself was prosecuted for petty theft, as she put it, when she was younger, and she also has cousins that have been incarcerated, two in particular, that she shared with us, one being a result of assaulting his or her mother and another for assaultive allegations." "Those ... circumstances ... certainly would lend itself to excusing Ms. [S.] for reasons other than" discrimination.

The prosecutor agreed with the court and added, "[S]he indicated that one of her relatives ... was convicted of charges as a result of an assault that resulted from what she termed a mental breakdown, which is psychologically similar, but not the same situation as the defense is arguing in this case." He also noted that "prospective juror number one [was] also African-American and the People accepted the panel with her on it."

People v. Collins, 60 Cal. App. 5th 540, 547-50 (2021).

### c.   Appellate Court's Review of First Batson Hearing

The appellate court first noted that the trial court had applied the wrong standard by applying a "no other reason" or "only reason" standard to the first-stage review. Collins, 60 Cal.App.5th at 552. The appellate court then conducted a review of the record to determine the legal question whether Petitioner's showing supported an inference that the prosecutor excused a juror for an improper reason. Id. Upon review, the appellate court concluded that the trial court's three race-neutral reasons for striking Margo S. were unsupported and contradicted by the record. Id. at 552-555. The court found that the facts were sufficient to raise a reasonable inference of discrimination and determined that the trial court erred in concluding Petitioner had failed to show a prima facie case. Id. at 555.  The court remanded the matter to the trial court to proceed with steps two and three of the Batson test, if feasible. Id. at 555-556.

### d.   Remand to Trial Court

The appellate court summarized the remand to the trial court as follows:

On remand, the prosecutor filled approximately 300 pages [Fn.3] in the record explaining his thought process during jury selection. He also introduced into evidence his contemporaneous notes on each juror. [Fn.4] At the outset, the prosecutor noted the juror-at-issue's "excusal ... was intricately linked to the facts of [the] case" and mentioned "jury selection happens very fast" so his "notes" did not encapsulate "exactly what [he] was thinking ....."

> [Fn.3] Our background summarizes the prosecutor's remarks for context. It is not a verbatim recitation of every individual point or word.

[Fn.4] For the prospective juror at issue, the prosecutor's notes verbatim read: "Psyc Tech At CDC. Single 7yrold daughter. Cartoon te-shirt. Responds with noods. Deales with mental health inmates[.]" (Multiple errors in original.)

The prosecutor emphasized that the biggest "issue in this case" was mental health—"was it PCP or was it ... schizophrenia?" The prosecutor believed Collins's mental health defense—if presented—was based on "document[ation] by ... mental health workers in [a] correctional facility." These workers, he explained, were "like" the prospective juror who worked as a "psych tech" at the California Department of Corrections and Rehabilitation.

The prosecutor was "very, very concerned about the fact that [he would] have to," to undermine a probable defense, "attack [the prospective juror's] profession ... indirectly ...." He found it challenging to discredit "mental health workers in correctional facilities" with the prospective juror sitting on the jury. He believed she was "more inclined to accept" a mental health defense because the evidence "line[d] up with the world she [knew]." The fact her "own cousin [was] incarcerated" for a crime "result[ing] from ... a mental breakdown ... reinforc[ed]" that concern.

The reason the prosecutor did not specifically question the prospective juror, he said, was because he neither wanted to lend credence to the mental health defense nor did he wish to ask an objectionable question relating to "her perspectives ...." He also stated, "[T]hat field had sort of been plowed," [Fn.5] meaning he felt he "had enough information ... to make an informed decision and ... additional follow-up" would not help. [Fn.6]

[Fn.5] The "field" presumably refers to the prospective juror's answer she could set her profession and experience aside by relying solely on the evidence presented in court.

[Fn.6] The prosecutor explained he had "the luxury ... of being able to [ask questions] after the Court's questions and the defense questions ...."

Another issue for the prosecutor was the prospective juror's ambiguity about her ability to follow the court's instructions. For example, while she answered she could rely solely on the evidence in the case, she also said "if it wasn't correct, [she] would show proof of what they said wasn't correct, like if [she] could pull it up on the Internet or something [and] say look, this was wrong ...." Also troubling was the fact "the rest of the jurors" knew about her profession because they might seek her opinion notwithstanding the court's instructions.

Last, the prosecutor explored the differences he discerned between the prospective juror at issue and other jurors. One juror with experience in mental health was not objectionable because he did not work in a "correctional" setting, like the prospective juror. Another's relative's crime was neither violent nor "stemm[ed] from mental illness," unlike the prospective juror's cousin.

Finally, another juror comparable to the prospective juror was strategically deemed acceptable because "it was extremely unlikely that the defense was going to keep [that] juror." The prosecutor noted numerous other "offsetting characteristics" between various jurors throughout the hearing. [Fn.7]

[Fn.7] The prosecutor explained he had "the luxury ... of being able to [ask

questions] after the Court's questions and the defense questions ...."

A juror with a prior "first-degree burglary" conviction deemed acceptable, for example, "[took] the cake" "if ... measur[ed] ... against" the prospective juror's "petty theft prior ...." Admittedly, the prosecutor "ha[d] a hard time explaining why" petty theft in particular "resona[ted]" as a concern.

In sum, the prosecutor stated he "evaluat[ed a potential juror's] risk" " in totality." Relative to the prospective juror, neither the "prior petty theft" nor "the cousin who was incarcerated" was "determinative." Her "position as a psych tech, combined with other things ... related to [her] profession," however, were a dealbreaker.

### Arguments

Collins's attorney first argued he was at "a disadvantage" because he "wasn't present at the trial." [Fn.8] He lamented the prosecutor's ability "to comment ... on ... demeanor," because he himself did not "have the ability to do that." Multiple times, he highlighted inconsistencies and pointed out flaws in the prosecutor's logic.

> [Fn.8] The prosecutor explained he had "the luxury ... of being able to [ask questions] after the Court's questions and the defense questions ...."

For example, Collins's attorney noted the prosecutor believed a juror whose parents "were [both] arrested" was more favorable than the prospective juror whose "cousins were arrested ...." He also argued a "first-degree burglary" conviction was a "much greater concern" than "petty theft ...."

Ultimately, Collins's attorney reemphasized his "disadvantage" from not being "in the courtroom" during the trial. [Fn.9] He concluded by claiming "the Court [was] in the position of assessing the credibility of reasons that originated with the Court."

> [Fn.9] This comment specifically related to the prosecutor's written note the prospective juror was wearing a cartoon-type "T-shirt." The prosecutor, for his part, disavowed relying on the T-shirt to justify the strike because he had no "independent recollection of that fact ....". The court likewise "set[ ] aside the T-shirt observation ...."

The prosecutor directly rebutted some of Collins's counsel's criticisms. He added that the original trial counsel "could have [been] called ... as a witness" if necessary.

### Ruling

The court began by finding there was "a sufficient record ... to adequately" rule on the issues, partly because the prospective juror's "demeanor while in court [was] not ... an issue." In other words, the written record was sufficient, and courtroom observations of the prospective juror were immaterial. It acknowledged it "must determine the genuineness of the [prosecutor's] proffered explanations" and explained it had "observed the demeanor and sincerity of the prosecutor" "throughout [the] hearing ...."

In answering that inquiry, the court credited the prosecutor's concern about "the ...

12

anticipated defense involving mental illness." The credited concern was buttressed by the fact the prosecutor filed "in limine motions," prior to jury selection, seeking to limit "mental illness" evidence. The court also accepted the prosecutor's "explanation ... as to why he did not ask certain questions" of the prospective juror.

Finally, the court agreed with the prosecutor "the differences" between the prospective juror at issue and the other juror with a "similar profession[ ]" "were significant," i.e., working in a "custodial setting" versus "a non-custodial setting." The court subsequently concluded the prosecutor "appear[ed] credible" in explaining "his reasons for accepting and excusing jurors in this case." It then reinstated the judgment as directed. [Fn.10]

> [Fn.10] This comment specifically related to the prosecutor's written note the prospective juror was wearing a cartoon-type "T-shirt." The prosecutor, for his part, disavowed relying on the T-shirt to justify the strike because he had no "independent recollection of that fact ....". The court likewise "set[ ] aside the T-shirt observation ...."

People v. Collins, 2023 WL 7177555, at *2-4 (Cal.Ct.App. 2023), *review denied* (Jan. 10, 2024).

e.        Appellate Court Decision

The California Court of Appeal determined that the trial court did not err in finding it could proceed with a full Batson inquiry or in concluding there was no discrimination. In the last reasoned decision, the appellate court stated as follows:

**I. Motion Properly Concluded**

Collins argues the trial court erred in denying, after remand, a motion for new trial. The People contend "[t]he trial court did not abuse its broad discretion" in denying the motion. We agree with the People.

**A. Additional Background**

After remand, and prior to the hearing summarized above, Collins's attorney filed a nonstatutory motion for new trial. The motion asserted a new trial was warranted "due to the passage of time," because "an accurate credibility assessment [could not] be conducted," and because "the prosecutor [was] not credible ...."

The trial court denied the motion, reasoning it was not "impossible for [it] to judge the sincerity of any explanation the prosecutor" might provide and a sufficient record existed to allow counsel on remand "to participate in" the *Batson/Wheeler* motion. It later repeated a similar ruling during the full hearing, as described above, because counsel renewed the argument.

**B. Analysis**

The decision to grant or deny a new trial due to an inability to conclude a *Batson/Wheeler* motion after remand presents a mixed question of law and fact. A reviewing court independently answers the question. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1231; *People v. Ault* (2004) 33 Cal.4th 1250, 1261-1262

["protect[ing a] party's right to a fully impartial jury" requires "independent review of the trial court's reasons for denying a new trial motion"].)

Here, we do not find a new trial was justified due to the passage of time or an inability to assess the prosecutor's credibility. The only piece missing from jury selection was Collins's trial counsel. The judge was present, the prosecutor was present, Collins was present, a complete transcript existed, and the prosecutor's notes were available. Apparently, Collins's original trial counsel was also available if needed for investigation or testimony. [Fn.11]

> [Fn.11] When, after remand, the prosecutor suggested Collins's trial counsel was available "as a witness," there was no objection or refutation.

It is true that Collins's counsel after remand was new to the case. That does not mean, however, it was impossible to investigate the matter through Collins himself, the original trial attorney, any other person present during jury selection, and the record itself. (*Cf. People v. Johnson* (2006) 38 Cal.4th 1096, 1102 [unavailability of original trial judge "does not make a limited remand impossible."].)

Collins's last point—that the prosecutor was not credible—is simply irrelevant to whether the record is sufficient to proceed with concluding a *Batson/Wheeler* motion after remand. [Fn.12] Credibility is the ultimate issue at step three, which we turn to next. [Fn.13]

> [Fn.12] Collins also asserts "[t]he [trial] court [originally] provided the prosecutor with a roadmap of reasons it thought acceptable, so the court [was] now in a position to evaluate itself, which is an impossible task." We disagree. Even if we assume the prosecutor simply parroted the trial court, that does not mean the prosecutor's credibility was neither not at issue nor impossible to discern, as discussed *post*.

> [Fn.13] It does not appear Collins challenges the step two inquiry, i.e., that the prosecutor provided a race-neutral rationale. Were we to address the issue, we would readily find the prosecutor's rationale was race-neutral.

**II. No Error in Finding Prosecutor Credible**

"At the third step of the *Batson/Wheeler* analysis, the trial court evaluates the credibility of the prosecutor's ... explanation. Credibility may be gauged by examining factors including but not limited to "'the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy."'" [Fn.14] (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1168 (*Gutierrez*).)

> [Fn.14] "The Constitution forbids discriminatory strikes against jurors in all cases, civil and criminal, and applies equally to defendants, plaintiffs, and prosecutors alike." (*Collins, supra*, 60 Cal.App.5th at p. 551, fn.7.) We use language referring to prosecutors simply because that is the situation in this case.

"""[T]he decisive question"'" is whether the prosecutor """should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the [prosecutor.]"' [Citation.] 'A trial court is best situated to evaluate ... the credibility of the prosecutor ....'" (*People v. Baker*

(2021) 10 Cal.5th 1044, 1077 (*Baker*).) "'[W]hen the trial court makes a sincere and reasoned effort to evaluate [credibility], the reviewing court defers to its conclusions on appeal, and examines only whether substantial evidence supports them.'" (*Ibid*.; *Miller-El, supra*, 537 U.S. at p. 340 "'[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal' and will not be overturned unless clearly erroneous.".)

The trial court in this case did not err in finding the prosecutor credible. The prosecutor's explanations, at the time the original objection was made, and after remand, remain consistent. Importantly, they are consistent with the prosecutor's contemporaneous notes about the prospective juror, suggesting strongly they were not the product of afterthought.

The prosecutor's concerns about mental health evidence and the prospective juror's reluctance or willingness to follow the court's instructions are legitimate. Although in the prior appeal we found logic lacking on these points, especially when compared to other jurors, we did not assess the prosecutor's genuineness or sincerity.

Indeed, we explicitly acknowledged "the validity of the prosecutor's justification is not relevant to defeating a prima facie case" at step one. (*Collins, supra*, 60 Cal.App.5th at p. 554, fn. 11.) We also noted "'"[a] reason that makes no sense is nonetheless"' a valid reason as long as it is genuine and nondiscriminatory." (*Ibid*.) That applies well to the prosecutor's most questionable rationale: the prospective juror's prior petty theft. [Fn.15]

> [Fn.15] Again, it is unclear if the petty theft was indeed a prior. How the case resolved, or if there even was a case, is not disclosed in the record.

The prosecutor himself acknowledged explaining why petty theft was more concerning than first degree burglary was difficult to articulate. We find it hard to understand. Were this the only rationale, it might not withstand scrutiny. The prosecutor, however, disavowed ascribing determinative weight to any singular concern, focusing instead on a juror's potential "in totality."

The judge credited the prosecutor's total explanation, particularly the prospective juror's experience with mental health in a custodial setting. Having reviewed the entire record, we find substantial evidence supports that conclusion. [Fn.16] (*Baker, supra*, 10 Cal.5th at p. 1077.)

> [Fn.16] We previously engaged in comparative juror analysis in the prior appeal. (*E.g., Collins, supra*, 60 Cal.App.5th at pp. 548-555.) That analysis, in our view, does not and cannot conclusively answer whether the prosecutor in this case was credible. (*Cf. Gutierrez, supra*, 2 Cal.5th at p. 1174 ["Court of Appeal erred in refusing to undertake comparative juror analysis."].)

Beyond substantial evidence, we find no occasion to conclude the prosecutor was less than truthful. Although the prosecutor's repeated references to "prior petty theft" lack a certain logic, in our view that is not fatal to his credibility on this record. (*See Collins, supra*, at 60 Cal.App.5th at p. 553 [prospective juror "'charged with a petty theft when [she] was younger,' [but] ... never asked how the charges were resolved" nor did record "otherwise disclose the answer[ ]"]; *People v. Stanley* (2006) 39

1      Cal.4th 913, 936 [" '[a] reason that makes no sense is nonetheless' " a valid
       reason as long as it is genuine and nondiscriminatory.].)
2

3    Collins, 2023 WL 7177555, at *4-5.

4                    f.    Federal Standard

5           Racial discrimination by the state in jury selection offends the Equal Protection Clause.

6    Miller–El v. Dretke, 545 U.S. 231, 238 (2005).  A criminal defendant is denied equal protection

7    of the law if he is indicted by a grand jury or tried by a petit jury from which members of his race

8    have been excluded because of their race.  Eubanks v. Louisiana, 356 U.S. 584, 585 (1958).

9    Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges

10   violates the Equal Protection Clause of the United States Constitution.  See Batson v. Kentucky,

11   476 U.S. 79, 85 (1986); Johnson v. California, 545 U.S. 162 (2005).  A defendant, however, has

12   no right to a "petit jury composed in whole or in part of persons of his own race."  Batson, 476

13   U.S. at 85 (quoting Strauder v. West Virginia, 100 U.S. 303, 305 (1879)).  Rather, a defendant

14   has the right to be tried by a jury whose members are selected pursuant to nondiscriminatory

15   criteria.  Id. at 85–86 (citing Martin v. Texas, 200 U.S. 316, 321 (1906)).

16          A Batson challenge involves a three-step analysis:

17          First, the movant must make a prima facie showing that the prosecution has engaged
            in racially discriminatory use of a peremptory challenge.  Second, once the trial
18          court decides a prima facie case has been established, the burden shifts to the
            prosecutor to articulate a race-neutral explanation for the challenges.  Third, the trial
19          court must determine whether the defendant has established purposeful
            discrimination.  If the defendant fails to establish a prima facie case, the burden does
20          not shift to the prosecution, and the prosecutor is not required to offer an explanation
            for the challenge.
21

22   Tolbert v. Gomez, 190 F.3d 985, 987-88 (9th Cir.1999) (internal citations omitted).

23          Here, the state courts determined that Petitioner had established a prima facie case.  Thus,

24   the court proceeds to the second and third steps of the Batson analysis.

25          At the second step, "the burden of production shifts to the proponent of the strike to come

26   forward with a race-neutral explanation" for it.  Purkett v. Elem, 514 U.S. 765, 767 (1995) (per

27   curiam). The prosecutor need not give one that is "persuasive, or even plausible," but it must not

28   offend equal protection.  Id. at 768; see also Rice v. Collins, 546 U.S. 333, 338 (2006) ("[S]o long

                                         16

1    as the reason is not inherently discriminatory, it suffices."). "Unless a discriminatory intent is

2    inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Purkett,

3    514 U.S. at 768 (citation omitted).

4        At the third step, the court has "the duty to determine if the defendant has established

5    purposeful discrimination." Batson, 476 U.S. at 98. In making that determination, the trial court

6    must evaluate the "persuasiveness" of the prosecutor's articulated reasons. Miller-El v. Cockrell,

7    537 U.S. 322, 338 (2003); Purkett, 514 U.S. at 768. The court "must undertake 'a sensitive

8    inquiry into such circumstantial and direct evidence of intent as may be available.'" Batson, 476

9    U.S. at 93 (quoting Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977)). It

10   has a duty to "decide not only whether the reasons stated are race-neutral, but whether they are

11   relevant to the case, and whether those stated reasons were the prosecutor's genuine reasons for

12   exercising a peremptory strike, rather than pretexts invented to hide purposeful discrimination."

13   Green v. LaMarque, 532 F.3d 1028, 1030 (9th Cir. 2008).

14       The critical issue at the third step is the prosecutor's credibility. See Hernandez v. New

15   York, 500 U.S. 352, 365 (1991); Batson, 476 U.S. at 98 n.21. Factors by which credibility can be

16   measured include, among others, "the prosecutor's demeanor; ... how reasonable, or how

17   improbable, the explanations are; and ... whether the proffered rationale has some basis in

18   accepted trial strategy." Miller-El, 537 U.S. at 339. The "evaluation of the prosecutor's state of

19   mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" Id.

20   (quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985)). Accordingly, considerable deference is

21   due that determination. See Rice, 546 U.S. at 341-42 (that "[r]easonable minds" might disagree

22   about prosecutor's credibility "does not suffice to supersede the trial court's credibility

23   determination"); Miller-El, 537 U.S. at 340.

24       A comparative analysis of the challenged jurors and those who went unchallenged may

25   show that race-neutral reasons are a pretext for discrimination. See Miller-El v. Dretke, 545 U.S.

26   231, 241 (2005); Kesser v. Cambra, 465 F.3d 351, 358 (9th Cir. 2006) (en banc). "Peremptory

27   challenges cannot be lawfully exercised against potential jurors of one race unless potential jurors

28   of another race with comparable characteristics are also challenged." McClain v. Prunty, 217 F.3d

17

1209, 1221 (9th Cir. 2000). Comparative-juror analysis is the "centerpiece" of the <u>Batson</u> inquiry.

<u>Boyd</u>, 467 F.3d at 1150. <u>Batson</u> and its progeny don't "require trial courts to conduct a

comparative juror analysis," however. <u>Murray</u>, 745 F.3d at 1005; <u>see also</u> <u>Sifuentes v. Brazelton</u>,

825 F.3d 506, 522 (9th Cir. 2016) (as amended) (reviewing <u>Batson</u> claim under AEDPA

deference even though state court did not conduct comparative-juror analysis). Rather, such

analysis "is an important means for federal courts to review a trial court's ruling in a <u>Batson</u>

challenge." <u>Murray</u>, 745 F.3d at 1005.

   In reviewing a state court's <u>Batson</u> determination, a federal habeas court "review[s] the

relevant portions of the record and use[s] ordinary analytic tools to evaluate the prosecutor's race-

neutral explanations" to determine whether the state court's decision was "based on an

unreasonable determination of the facts in light of the evidence." <u>Sifuentes</u>, 825 F.3d at 517-18. It

considers the following factors:

> • statistical evidence about the prosecutor's use of peremptory strikes against [minority] prospective jurors as compared to white prospective jurors in the case;
>
> • evidence of a prosecutor's disparate questioning and investigation of [minority] and white prospective jurors in the case;
>
> • side-by-side comparisons of [minority] prospective jurors who were struck and white prospective jurors who were not struck in the case;
>
> • a prosecutor's misrepresentations of the record when defending the strikes during the <u>Batson</u> hearing;
>
> • relevant history of the State's peremptory strikes in past cases; or
>
> • other relevant circumstances that bear upon the issue of racial discrimination.

<u>Flowers v. Mississippi</u>, 588 U.S. 284, 302 (2019); <u>see</u> <u>Ervin v. Davis</u>, 12 F.4th 1102, 1106-08

(9th Cir. 2021) (explaining that federal habeas courts should consider <u>Flowers</u> factors when

record contains evidence applicable to them). The court "must conduct a comparative juror

analysis in the first instance if the state reviewing court has not done so." <u>Sifuentes</u>, 825 F.3d at

518 n.4 (citing <u>Jamerson v. Runnels</u>, 713 F.3d 1218, 1225 (9th Cir. 2013)). And when a state

court fails to perform its "affirmative duty" under step three, a habeas court "must conduct that

analysis de novo, rather than remanding for the state courts to do so." <u>Green</u>, 532 F.3d at 1031.

   A habeas court considers whether the state court's decision was "not merely wrong, but

18

actually unreasonable." Sifuentes, 825 F.3d at 517 (citation omitted).

> The pertinent question is not whether the prosecutor was credible, or even whether the trial court's conclusion to that effect was clearly erroneous. Rather, the pertinent question is whether the state appellate court was objectively unreasonable in upholding the trial court's determination.

Id. at 518. This review is "doubly deferential." Id. (citation omitted).

### g.    Analysis – Time Delay

Petitioner's first claim concerns the four-year delay between jury selection and the Batson evidentiary hearing. He contends the length of time deprived him of his constitutional rights because the delay was itself constitutionally defective. Petitioner, however, fails to point to any constitutional authority establishing that a long delay, by itself, renders the evidentiary hearing ineffective. As noted by Respondent, in both Batson, 476 U.S. at 100, and Johnson, 545 U.S. at 173, the Supreme Court remanded the matter to the trial court for evidentiary hearings on steps two and three. Indeed, the four-year delay was well within the duration of time deemed permissible by other courts. See Hooper v. Ryan, 729 F.3d 782, 787 (7th Cir. 2013) (32-year delay); Crittenden v. Ayers, 624 F.3d 943, 952 (9th Cir. 2010) (14-year delay); Johnson v. Finn, 665 F.3d 1063, 1066 (9th Cir. 2011) (10-year delay). Thus, the appellate court's decision to remand the matter for evidentiary hearing was consistent with clearly established federal law.

Petitioner also fails to show the state court's determination that the hearing was feasible was unreasonable. The record shows the trial court had more than adequate records with which to conduct the Batson inquiry, including voir dire transcripts; testimony from the prosecutor; the prosecutor's jury selection notes; trial transcripts; and recollections of the trial court. Petitioner fails to show that the trial court could not properly assess the prosecutor's credibility in determining whether his stated reasons were discriminatory. See, e.g., Paulino v. Harrison, 542 F.3d 692, 701 n.8 (9th Cir. 2008) (Batson inquiry was properly conducted where "the transcript of jury voir dire itself illuminate[d] the prosecutor's actual reasons"); Turner v. Marshall, 121 F.3d 1248, 1251 (9th Cir. 1997) (holding that voir dire transcripts and evidentiary hearing provided sufficient basis for review, notwithstanding prosecutor's limited recollection).  Thus, the claim is without merit and should be denied.

h.    Analysis – Peremptory Challenge

As previously noted, the prosecutor exercised a peremptory challenge against Margo S., a prospective Black juror. Petitioner immediately raised a Batson challenge. Ultimately, the state courts determined that the challenge was not discriminatory. The Court finds the state court's determination was not unreasonable.

*1.    Prosecutor's Reasons for Challenge*

During the Batson hearing on remand, the prosecutor discussed the reasons for excusing Margo S. He described the various factors he stated were risks that could contribute to an uneven playing field favoring the defense theory.

Foremost in the prosecutor's mind was Margo S.'s background in mental health. The prosecutor noted that Petitioner was a user of PCP, which is a drug that mimics the effects of psychosis. (Doc. 14-30 at 16.) During the aftermath of the collision, Petitioner displayed many of the psychotic behaviors one would expect from a user under the influence of PCP. (Doc. 14-30 at 17.) But after he had a phone call with his girlfriend who advised him to plead insanity, the prosecutor believed Petitioner began to fashion his responses to jail personnel in an attempt to establish a defense based on insanity. (Doc. 14-30 at 18.)

The prosecutor stated one of the hurdles he would have to overcome is the treating doctor's diagnosis of schizophrenia versus the effects of PCP. (Doc. 14-30 at 24-25.) He noted he would have to convince the jurors that Petitioner's actions were not the result of a mental illness but because he was under the influence of PCP. (Doc. 14-30 at 38.) The prosecutor noted he would have to convince the jurors to disagree with the expert, and this expert had based his report on evaluations conducted by mental health workers who were employed in correctional facilities, such as Margo S. (Doc. 14-30 at 25-26.) The prosecutor's primary concern was that he would have to challenge the opinions of mental health workers in correctional facilities such as Margo S. (Doc. 14-30 at 39.) The prosecutor stated he was worried Margo S.'s background would provide a "very uneven playing field for [the prosecution]." (Doc. 14-30 at 43.) He was concerned that the facts of the case would line up with her own experiences that in general, "people who commit crimes often do so as a result of mental illness." (Doc. 14-30 at 43.) Thus, he was concerned

1  Margo S.'s background would cause herself, as well as influence fellow jurors, to find Petitioner

2  committed the acts due to mental illness, thus negating the required *mens rea*.

3       With respect to the contention that he did not delve further into these concerns with Margo

4  S., the prosecutor noted his methodology in conducting voir dire is a "very surgical approach to

5  asking questions of jurors." (Doc. 14-30 at 8, 57.) His norm is not to ask a lot of questions but

6  rather to ask pointed and direct questions. (Doc. 14-30 at 57.) He noted that he only asked

7  questions of 13 out of 37 potential jurors. (Doc. 14-30 at 91.) In addition, he was concerned that

8  asking questions regarding mental health issues would lend credence to the defense theory. (Doc.

9  14-30 at 54-56.)  He noted that the subject had already been adequately explored by the defense,

10  and further questioning would only sponsor the defense theory by suggesting that the prosecutor

11  also believed mental illness may have contributed to the crime.

12       Second, the prosecutor noted that Margo S. had a prior petty theft and a cousin who had

13  been incarcerated. (Doc. 14-30 at 66, 127.) While neither factor was determinative to him, he

14  found they presented additional risk factors. (Doc. 14-30 at 66.) Of great significance was the fact

15  the cousin had been incarcerated because of a mental breakdown. (Doc. 14-30 at 66.) The

16  prosecutor stated it was concerning that Margo S. made a point in qualifying her cousin's

17  incarceration as due to a mental breakdown. (Doc. 14-30 at 127.) This fact, in light of her

18  background, was significant to the prosecutor because it signaled she may be more inclined to

19  follow the defense's theory that Petitioner committed the crime due to mental illness. (Doc. 14-30

20  at 127-128.)

21       A third concern for the prosecutor was Margo S.'s position as a caretaker of inmates.

22  (Doc. 14-30 at 70.) Margo S. had stated her day-to-day activities involved checking on inmates

23  and making sure they were eating, sleeping, taking care of themselves, and making sure they were

24  not suicidal. (Doc. 14-30 at 70.) The prosecutor was concerned that the duty of care she owed to

25  inmates might influence her view of Petitioner causing her to be more sympathetic to his

26  situation. (Doc. 14-30 at 71.) Again, the prosecutor determined her caretaker background would

27  cause her to find he acted because of a mental illness.

28       The fourth concern described by the prosecutor was Margo S.'s response to defense

1    counsel concerning mental health evidence. (Doc. 14-30 at 74-75.) When initially questioned on

2    what she would do if evidence was put forth that conflicted with her own knowledge, Margo S.

3    stated she would advise fellow jurors that the information was wrong and prove it by searching it

4    on the internet. (Doc. 14-30 at 75.) Although she stated she would not do so if advised she could

5    not, the prosecutor viewed this as another risk. While she stated she would not do so on further

6    questioning, her first inclination was to do so, and the prosecutor had no guarantee she would not

7    act according to her first inclination. (Doc. 14-30 at 77.)  This factor was especially concerning

8    because Margo S. had stated she would voice her disagreement with the rest of the panel and look

9    up the information to prove her point, despite the Court's many prior admonitions not to consult

10    outside evidence to the potential jury as a whole, and to individual jurors' responses. (Doc. 14-30

11    at 77-82.)

12        Upon review of the record, the Court finds that the prosecutor's stated reasons for

13    dismissal were "permissible and plausible." Sifuentes, 825 F.3d at 518.  The state court

14    reasonably concluded that the prosecutor's explanations for striking Margo S. were credible and

15    did not evince a race-based motivation.  Indeed, while the prosecutor challenged Margo S., he

16    accepted two other Black jurors who served as primary jurors. The prosecutor's reasons were

17    supported by the record and without misrepresentation.

18                    *2.  Comparative Analysis*

19        In addition, a comparative analysis between Margo S. and other venire members the

20    prosecutor did not challenge does not demonstrate pretext or discrimination. As the parties and

21    state courts acknowledge, prospective juror Brad D. was closest to Margo S. in comparison. They

22    had similar backgrounds in mental health. The prosecutor distinguished the two by pointing out

23    Margo S. was a psych tech in a correctional facility whereas Brad D. was not. (Doc. 14-30 at 38,

24    98.) Brad D. had no connection to correctional facilities which the prosecutor found advantageous

25    to his position. (Doc. 14-30 at 98.) Whereas the prosecutor believed Margo S. would be defensive

26    to any criticism of mental health work performed in correctional facilities, he believed Brad D.

27    would not be so inclined. (Doc. 14-30 at 100-101.) Brad D. did not share the same connection

28    between crime and mental illness. (Doc. 14-30 at 101.) The prosecutor was also impressed by

1     Brad D.'s emphatic response that he could set aside his background in performing his duties as a

2     juror. (Doc. 14-30 at 101.) Brad D. also did not have any prior convictions or family members

3     who had priors, as compared to Margo S. (Doc. 14-30 at 102.) In addition, the prosecutor

4     believed the fact that Brad D. was married was beneficial for a juror, because he believed married

5     persons are generally adept at working through issues together; he noted that Margo S. was

6     single. (Doc. 14-30 at 103-04.) Brad D.'s position as a supervisor also demonstrated that he could

7     manage and cooperate with others, which was a good skill to have during jury deliberations.

8     (Doc. 14-30 at 104.)

9        In addition, Margo S. shared some attributes with other prospective jurors that also caused

10    the prosecutor to challenge them. Peggy B. stated she had a nephew who had faced criminal

11    charges due to his bipolar mental illness. (Doc. 14-30 at 67.) Peggy B. was the prosecutor's first

12    challenge. (Doc. 14-30 at 67.)

13        Finally, it again bears noting that of the four potential jurors who were Black including

14    Margo S., one was excused for hardship, but the two remaining were not challenged by the

15    prosecutor and became primary jurors who decided the case. While not determinative, this fact

16    did lend credibility to the prosecutor's disavowal of race having any bearing on his challenges.

17                 i.      <u>Conclusion</u>

18        In summary, the prosecutor's reasons were founded in the record and displayed no

19    indication of race-based motivation. The state court reasonably determined the prosecutor was

20    credible and his reasons were plausible and permissible. In addition, a comparative analysis of the

21    jury showed the prosecutor did not treat potential White jurors differently from minorities. The

22    state court identified valid non-pretextual reasons distinguishing Margo S. from other non-

23    challenged jurors. Thus, Petitioner fails to show that the state court's decision was contrary to, or

24    an unreasonable application of, Supreme Court precedent, nor does he show that the state court's

25    decision was based on an unreasonable determination of the facts in this case. The claim should

26    be denied.

27

28

1              2.    <u>Ground Two - Insufficiency of the Evidence</u>

2         Petitioner next claims the evidence was insufficient to support the jury's finding of

3 implied malice. Petitioner raised this claim on direct review. In the last reasoned decision, the

4 Fifth DCA rejected the claim as follows:

5
6      Collins was convicted of two counts of second degree murder. He now argues the evidence did not prove murder because implied malice was not proven. We disagree.

7      "In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational
8 trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient
9 evidence—that is, evidence that is reasonable, credible, and of solid value— supporting the decision, and not whether the evidence proves guilt beyond a
10 reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the
11 existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of
12 fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings*
13 (2010) 50 Cal.4th 616, 638-639.)

14      Second degree murder requires proof of an act, committed with malice aforethought, resulting in death. (§ 187; *People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).)
15 Malice aforethought may be express or implied. (*Ibid.*) Implied malice exists when a person performs an act, the natural and probable consequences of which are
16 dangerous to human life, and acts with conscious disregard to that danger. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) "'[I]mplied malice [involves] "both a
17 physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.'
18 [Citation.] The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and ... acts with conscious disregard for
19 life.'" (*People v. Soto* (2018) 4 Cal.5th 968, 974 (*Soto*).)

20      Murder based on the act of driving while intoxicated does not require proof "of a 'predicate act,' i.e., a prior DUI or an alcohol-related accident necessary to establish
21 implied malice." (*People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1091 (*Johnigan*).) "'[L]ike all other elements of a crime, implied malice may be proven
22 by circumstantial evidence.'" (*People v. Jimenez* (2015) 242 Cal.App.4th 1337, 1358.)
23
24      The record here sufficiently proved implied malice. [Fn.15] The physical component of implied malice is not at issue. Suffice it to say, driving a car at speeds
25 near or in excess of 100 miles per hour is dangerous to life. The evidence proving the mental component was compelling and sufficient.

26         [Fn.15] The act, causation, and death elements of murder are not disputed.

27      Perhaps most importantly, Collins admitted he drove after consuming alcohol "too many times." The jury could reasonably interpret his admission as a confession
28 regarding the dangers of intoxicated driving. "A confession is like no other evidence.

Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him .... [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct.'" (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296.)

Beyond Collins's admission, his driving itself exhibited an "actual awareness of the great risk of harm which he had created." (*People v. Watson* (1981) 30 Cal.3d 290, 301 (*Watson*).) Specifically, he drove down the road at extremely high speeds and nearly hit multiple vehicles but swerved to avoid collisions. The jury could reasonably infer his knowledge of dangerous conduct from the fact Collins actively avoided colliding with other vehicles multiple times before striking the victims' vehicle. (*Ibid.*)

Moreover, Collins's girlfriend testified she warned him about the dangers of driving "high" almost every day before the collision. He also signed four DMV forms indicating he had read the attendant warnings regarding intoxicated driving. [Fn.16] (See *People v. Wolfe* (2018) 20 Cal.App.5th 673, 683 [signed DMV form relevant to subjective knowledge].)

> [Fn.16] Collins further argues "the truth is that people do not read the reverse sides of such applications, any more than people read the 'terms and conditions' of car rental agreements." But his signature undoubtedly is evidence he read the warnings and it is the jury's exclusive prerogative to resolve the facts. The warnings read as follows: "I am advised that being under the influence of alcohol or drugs, or both, impairs the ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If I drive while under the influence of alcohol or drugs, or both, and as a result, a person is killed, I can be charged with murder."

The jury could also readily infer Collins knew he would need to drive after consuming alcohol because he was sober when he drove to the store to purchase the alcohol. (See *Watson, supra*, 30 Cal.3d at p. 300.) "It also may be presumed that [Collins] was aware of the hazards of driving while intoxicated. ... 'One who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard for the safety of others.'" (*Id.* at pp. 300-301; *Johnigan, supra*, 196 Cal.App.4th at p. 1091 [the danger of intoxicated driving is ""'"a very commonly understood risk"'"'.)

We need not, however, indulge in presumptions. Collins consciously disregarded the danger to other lives by traveling at nearly 100 miles per hour while making no attempt to stop at red lights with multiple vehicles along his path. Immediately before crashing, with multiple vehicles either slowing or stopped for a red light in front of him, Collins made no apparent attempt to slow his vehicle. Instead, he swerved onto the center divider attempting to pass the vehicles—as if they were obstacles in his path—and blow through yet another red light. Unfortunately, his attempt failed and he instead struck another vehicle with enough force to ignite it, killing two of its occupants and severely burning the third.

In sum, "Whether [Collins] was subjectively aware of the risk is best answered by the question: how could he not be? It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, [Collins] was aware of the risk."

1    (*People v. Moore* (2010) 187 Cal.App.4th 937, 941; see *Cravens, supra*, 53 Cal.4th
2    at p. 511 [jury may justifiably infer "defendant's subjective awareness" of dangerous
      conduct from "the circumstances ... alone"].) His conduct in swerving to avoid
3    collisions and still subsequently failing to stop—or even slow down—at red lights
      while driving nearly or more than 100 miles per hour exhibits a clear conscious
4    disregard for human life. His claim the evidence insufficiently proved murder is
      meritless.

5    Collins, 60 Cal. App. 5th at 556.

6                      a.      Federal Standard

7         The law on sufficiency of the evidence is clearly established by the United States Supreme

8    Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S.

9    307, the test on habeas review to determine whether a factual finding is fairly supported by the

10   record is as follows: "[W]hether, after viewing the evidence in the light most favorable to the

11   prosecution, any rational trier of fact could have found the essential elements of the crime beyond

12   a reasonable doubt."  Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781

13   (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a

14   reasonable doubt will a petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324.

15   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

16        If confronted by a record that supports conflicting inferences, a federal habeas court "must

17   presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any

18   such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326.

19   Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

20   conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

21        After the enactment of the AEDPA, a federal habeas court must apply the standards of

22   Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.

23   2005).  In applying the AEDPA's deferential standard of review, this Court must presume the

24   correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson,

25   477 U.S. 436, 459 (1986).

26        In Cavazos v. Smith, 565 U.S. 1, 2 (2011), the United States Supreme Court further

27   explained the highly deferential standard of review in habeas proceedings, by noting that Jackson,

28        makes clear that it is the responsibility of the jury - not the court - to decide what

                                               26

conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

       c.   <u>Analysis</u>

Here, the state court applied the correct standard in finding the evidence supported the jury's finding. Thus, the only question before this Court is whether that determination was unreasonable. The Court finds that it was not.

The appellate court found that the evidence supporting the finding that Petitioner was subjectively aware of the risk was overwhelming. As the appellate court stated, "how could he not be?" <u>Collins</u>, 60 Cal.App.5th 540.  First, Petitioner admitted to the risk, stating he drove after consuming alcohol "too many times." <u>Id</u>. This confession alone is fatal to his claim that he was unaware of the risk. In addition, his actions while driving showed he was conscious of the danger he created. While driving at a high rate of speed, he braked, slowed down, and swerved to avoid collisions multiple times. His actions in trying to avoid collisions demonstrate his knowledge of impending harm. Petitioner's girlfriend also testified that she had personally warned Petitioner on many occasions of the dangers of driving "high." Indeed, she stated she warned him almost every day, which he acknowledged in his conversations with her:

> [Petitioner's girlfriend]: . . .  And I keep tellin' you to stop drivin' that car, high. Go get some help. Let's go figure this out. And you don't want to do that. You learned the hard way.
>
> . . . .
>
> [Petitioner's girlfriend]: I know. But, you know, there's – it's decisions that you make so there's one you just gonna have ta – you know with this stuff there are consequences. You gonna have ta pay for what you did. I mean I taught us that y- I told you stop doin' that stuff. You wouldn't listen to me.
>
> . . . .
>
> [Petitioner's girlfriend]: I try to tell you every day about this stuff and you just didn't believe me. You wouldn't stop – even kept doin' it. You try to say I'm the

27

1    problem. Lik    e you was sayin' it's me goin' make you act like that. And that's
2    messed up. 'Cause I was the one that was there for you when I look you ass to the
     hospital it was me. It wasn't nobody else.

3    [Petitioner]: Yup. Dang babe.

4    (Doc. 14-19 at 253-254.) In addition, Petitioner himself signed four DMV forms on prior

5    occasions indicating he had read the warnings concerning impaired driving. His signature

6    constitutes evidence he was made aware of the risks. Finally, Petitioner's persistent actions in

7    driving at exceedingly high rates of speed while attempting to avoid collisions shows he had a

8    clear conscious disregard for human life.

9    Given the foregoing, this Court agrees that the evidence supporting implied malice was

10   overwhelming. Certainly, Petitioner fails to show that no fairminded jurist would agree with the

11   state court's conclusion. The claim should be denied.

12              3.    <u>Ground Three – Ineffective Assistance of Counsel</u>

13   In his third claim for relief, Petitioner alleges defense counsel was ineffective in failing to

14   object to the cross-examination testimony of psychologist Dr. Musacco, who stated that Petitioner

15   understood the nature and quality of his actions and appreciated the difference between right and

16   wrong. He further faults counsel for failing to object to the prosecutor's closing remarks referring

17   to Dr. Musacco's opinions. Petitioner raised this claim on direct review. The Fifth DCA rejected

18   the claim, as follows:

19         At trial, Dr. Musacco testified Collins understood the nature and quality of his
           actions and knew the difference between right and wrong *at the time* of the
20         collision. The prosecutor referenced this testimony multiple times in closing
           argument.
21
           Collins now faults his attorney for failing to object to the testimony and the
22         prosecutor's corresponding argument. The question squarely presented is whether
           Dr. Musacco's testimony is equivalent to an opinion Collins possessed the requisite
23         "mental component" of implied malice. (See *Soto, supra*, 4 Cal.5th at p. 974.) We
           need not, however, answer the question because we conclude a different outcome
24         at trial was not reasonably probable even absent the specific testimony and
           argument at issue.
25
           **A. Additional Background**
26
           A large portion of the trial focused on Collins's mental state while he drove the
27         vehicle that ultimately killed two victims. To that end, Collins sought to introduce
           evidence he suffered from a mental disease impairing his ability to appreciate or
28         understand the dangerousness of his conduct, and inhibiting his ability to

                                            28

consciously disregard that danger.

To accomplish the goal, Collins introduced portions of his interviews with law enforcement relating he did not remember driving at all. His lack of recollection was attributed to believing he was Jesus which caused tunnel vision, or because something entered his body, forcing him to "gun it" and otherwise black out. The prosecutor introduced other portions of those interviews, including that Collins remembered "put[ting] the pedal to the metal," "trying to make the car fly," and swerving and trying to slow down before crashing.

Collins also introduced evidence of his mental health issues through Dr. Musacco's testimony. Dr. Musacco believed Collins legitimately suffered from a mental illness especially because the illness was well documented both before and after the collision. For example, Collins was once hospitalized during an episode in which he experienced supernatural visions.

To undercut the force of Dr. Musacco's testimony, the prosecutor pointed out medical doctors had previously advised Collins to quit consuming PCP. The prosecutor also emphasized Dr. Musacco was originally appointed by the court to evaluate Collins's sanity but concluded Collins was sane at the time of the collision. Specifically, Dr. Musacco agreed with the prosecutor that Collins understood the nature and quality of his actions and knew the difference between right and wrong.

In closing argument, the prosecutor argued Collins "appreciated the difference between right and wrong. When he's out there, he knows that it's wrong to drive 95 to 110 miles an hour down a busy street. Oh, he knows it, absolutely. [Dr. Musacco] told you that he appreciated the difference between right and wrong." He continued, "But not just that. He understood the nature and quality of his actions. Another way to put that is he knows the difference between driving 110 miles an hour ... and throwing a piece of bubble gum out his window ... which is one of the reasons that I think you will find that the mental evidence in this case doesn't really have applicability." The prosecutor then explained mental health evidence was relevant to implied malice but voluntary intoxication was not.

Later, the prosecutor stated any mental health defense was limited by Dr. Musacco's opinion that Collins knew "the difference between right and wrong and ... probably more important than that, he understands the nature and quality of his actions. He's aware of that. And there's a whole lot of evidence that suggests that."

The prosecutor then listed the evidence supporting his argument including that Collins's girlfriend, family, and prior doctors had all in various ways advised him to quit using drugs. That "[h]e [had previously] signed four" DMV forms explaining the dangers of intoxicated driving. That he admitted to drinking and driving "[t]oo many" times. And that "one of the single best pieces of evidence" was his recorded interview minutes after the collision in which, to quote the prosecutor, Collins remembered "swerving out of the way of a car" and trying "to slow down or ... to apply his brakes ...."

## B. Analysis

The Sixth Amendment guarantees the "'right to the effective assistance of counsel.'" (*Strickland v. Washington* (1984) 466 U.S. 668, 685-686.) "'[T]o establish a claim of ineffective assistance of counsel, [Collins] bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell

below an objective standard of reasonableness [¶] ... under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.""" (*People v. Bell* (2019) 7 Cal.5th 70, 125.) "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (*In re Gay* (2020) 8 Cal.5th 1059, 1086.)

"The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." (*In re Cox* (2003) 30 Cal.4th 974, 1019-1020; *People v. Carrasco* (2014) 59 Cal.4th 924, 982.) We follow that course here.

There are two distinct but related issues we must resolve. First, was Dr. Musacco's testimony admissible and, if not, was defense counsel ineffective for not objecting? Second, did the prosecutor urge the jury to find implied malice based on Dr. Musacco's testimony and, if so, was defense counsel ineffective for not objecting? We conclude any error is harmless on both accounts.

At the outset we note our Supreme Court, in *People v. DeHoyos* concluded an expert's opinion the defendant knew the difference between right and wrong at the time of a murder was irrelevant and inadmissible during a trial's guilt phase. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 118 (*DeHoyos*).) The Court also concluded the testimony was not otherwise inadmissible under sections 28 and 29 [Fn.17] because it was not "tantamount to stating an opinion that defendant did or did not have the mental state required for the crime charged ...." (*DeHoyos*, at p. 121.)

> [Fn.17] Sections 28 and 29, provide as relevant: "Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (§ 28, subd. (a).) And, "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged." (§ 29.)

The testimony here is more than that Collins knew the difference between right and wrong—it included the opinion he understood the nature and quality of his actions, i.e., driving a car at a high rate of speed. But the testimony itself, even if inadmissible under sections 28 and 29, was not prejudicial. Collins readily acknowledged he knew he was driving a car at a high rate of speed. Dr. Musacco's opinion added nothing to Collins's admission.

The prosecutor's argument poses a different question. Undoubtedly, the prosecutor referenced Dr. Musacco's irrelevant sanity opinion multiple times in closing argument and obviously linked it to the implied malice mental state element. But the prosecutor also closely tied the argument to the actual facts which were highly relevant to proving implied malice, i.e., prior warnings about intoxicated driving and Collins's driving itself exhibiting subjective knowledge regarding dangerous driving.

Significantly, the prosecutor bridged the gap between Dr. Musacco's irrelevant opinion and the evidence by referencing Collins's various admissions including "put[ting] the pedal to the metal," "trying to make the car fly," and trying to avoid a collision by swerving and engaging the brakes. Granted, Collins also made statements he did not remember driving, did not remember any traffic, and did not remember the collision either because he was Jesus or something entered his body and, presumably, took control of the vehicle. But those statements were inconsistent with prior contemporaneous admissions about remembering driving and swerving, and were largely "'unpersuasive in view of the other evidence, because [they were] "conclusory, self-serving, and not subject to cross-examination."'" (*People v. Suarez* (2020) 10 Cal.5th 116, 166.)

Critically, there was little to differentiate whether Collins's self-serving statements about Jesus and not remembering driving—if true—were due to a mental illness or instead voluntary intoxication. For these reasons, whether or not the prosecutor's argument was objectionable, Collins has not discharged his burden to show prejudice and our confidence in the outcome is not undermined. The ineffective assistance of counsel claim fails.

Collins, 60 Cal. App. 5th at 556.

a.    Federal Standard

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75 (1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things.  First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms.  Strickland, 466 U.S. at 687-88.  Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional

1    errors, he would have prevailed at trial. Id. at 694. A "reasonable probability" is a probability

2    sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what

3    counsel could have done; rather, it is whether the choices made by counsel were reasonable.

4    Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

5            With the passage of the AEDPA, habeas relief may only be granted if the state-court

6    decision unreasonably applied this general Strickland standard for ineffective assistance.

7    Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

8    federal court believes the state court's determination under the Strickland standard "was incorrect

9    but whether that determination was unreasonable–a substantially higher threshold."  Schriro v.

10   Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard

11   is "doubly deferential" because it requires that it be shown not only that the state court

12   determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

13   Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a

14   state court has even more latitude to reasonably determine that a defendant has not satisfied that

15   standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

16   application was unreasonable requires considering the rule's specificity.  The more general the

17   rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

18                                    b.  Analysis

19         The state court applied the correct Strickland standard and determined that Petitioner had

20   failed to demonstrate any prejudice resulting from counsel's failures to object. Thus, the only

21   question before the Court is whether that determination was unreasonable. Upon review of the

22   record, the Court agrees with the state courts.

23         As noted by the appellate court, Dr. Musacco's opinion that Petitioner knew the nature

24   and quality of his actions was already before the jury. Dr. Musacco had testified that Petitioner's

25   actions during the collision did not evince mentally "insane" behavior. (Doc. 14-10 at 134-35.)

26   Petitioner also admitted he knew he was driving a vehicle at a very high rate of speed. Thus, Dr.

27   Musacco's opinion added nothing.  Even if defense counsel would have objected to prosecutor's

28   question, the result would not have been different.

As to the prosecutor's references to Dr. Musacco's opinion, it is true the prosecutor linked the opinion to the element of implied malice. However, the prosecutor focused on the facts of the case which were highly relevant and compelling. The prosecutor pointed out that Petitioner had been warned numerous times by family not to drive under the influence. He reminded the jury Petitioner had signed multiple DMV forms acknowledging the dangers of driving under the influence of drugs and alcohol. Moreover, Petitioner's attempts to swerve and avoid collisions demonstrated he knew the nature and quality of his actions. Finally, Petitioner's contemporaneous admissions that he was "put[ting] the pedal to the metal," "trying to make the car fly," had driven impaired "too many times," along with his recollections of driving and attempting to avoid collisions overwhelmingly showed Petitioner harbored the requisite mental state. The Court finds that a fairminded jurist could conclude that even if defense counsel had objected to the prosecutor's remarks on Dr. Musacco's opinion, the outcome would not have been different given the overwhelming and compelling evidence of Petitioner's mental state. Petitioner fails to demonstrate that the state court rejection of his claim was an unreasonable application of Strickland. The claim should be denied.

**IV.    RECOMMENDATION**

Based on the foregoing, the Court **RECOMMENDS** that the First Amended Petition for Writ of Habeas Corpus (Doc. 8) be **DENIED** with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one (21) days after being served with a copy of this Findings and Recommendation, a party may file written objections with the Court and serve a copy on all parties. Id. The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendation" and shall not exceed fifteen (15) pages, except by leave of court with good cause shown. The Court will not consider exhibits attached to the Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity. Any pages filed in

excess of the fifteen (15) page limitation may be disregarded by the District Judge when

reviewing these Findings and Recommendations pursuant to 28 U.S.C. § 636 (b)(1)(C). The

parties are advised that failure to file objections within the specified time may result in the waiver

of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014). This

recommendation is not an order that is immediately appealable to the Ninth Circuit Court of

Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure,

should not be filed until entry of the District Court's judgment.

IT IS SO ORDERED.

Dated:  __November 5, 2025__             ___/s/ Sheila K. Oberto___

UNITED STATES MAGISTRATE JUDGE